# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| NB LOFT VUE, DST, | § Case No. 21-32292 |
| Debtor. | § |
| Tax I.D. No. 81-6793665 | § |
| In re: | § Chapter 11 |
| NB VUE MAC, DST, | § Case No. 21-32291 |
| Debtor. | § |
| Tax I.D. No. 47-7310124 | § |

## DECLARATION OF PATRICK NELSON IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST-DAY PLEADINGS

I, Patrick Nelson, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I am the Chief Executive Officer of Nelson Partners, LLC, located at 180 La Pata, San Clemente, California 92672, and have management authority over each of the Debtors. Nelson Partners is a nationally-recognized real estate investment firm specializing in developing, acquiring and managing high quality purpose-built off-campus student housing properties throughout the United States. In my capacity as CEO of Nelson Partners, I am familiar with all aspects of each of the Debtors' businesses and operations.

2.  To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their businesses, creditors, employees, and stakeholders, the Debtors have requested, or will request, certain types of relief in their "first day" pleadings and applications (each, "First Day Pleadings"). The First Day Pleadings seek relief intended to allow the Debtors

to effectively transition into chapter 11 and minimize disruption of the Debtors' respective business operations, thereby preserving and maximizing the value of the Debtors' assets.

3. I submit this Declaration in support of the Debtors' chapter 11 petitions (each filed on July 6, 2021), as well as the First Day Pleadings. I am familiar with the content of these documents and I believe that the relief sought in the First Day Pleadings: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity or value; (b) constitutes a critical element to achieving a successful sale or reorganization of the Debtors' assets and liabilities; and (c) best serves the Debtors' estates and creditors' interests.

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion, my experience and knowledge of the Debtors' operations and financial conditions, or are based upon knowledge of employees of the Debtors and/or Nelson Partners reporting to me that are derived in the course of their duties. If I were called upon to testify, I could and would testify to the facts set forth herein. I am authorized on behalf of the Debtors to submit this Declaration.

5. Part I of this Declaration describes the Debtors' businesses and properties and the circumstances surrounding the filing of their chapter 11 petitions. Part II of this Declaration sets forth the relevant facts in support of the various First Day Pleadings that have been or will be filed by the Debtors.

## PART I - BACKGROUND

6. On July 6, 2021 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas (the "Court") which commenced these chapter 11 cases.

**The Properties**

7. Debtor NB Loft Vue, DST ("Loft Vue") is a Delaware Statutory Trust that owns and operates the "Loft Vue Student Housing Apartments" (the "Loft Vue Facility") located at 3125 McCart Ave., Fort Worth, Texas 76110. The Loft Vue Facility is located two blocks from Texas Christian University ("TCU") and offers 81 fully furnished and unfurnished apartments, with a total of 147 beds, for TCU students. The Loft Vue Facility also offers a host of luxury amenities for its student tenants, including an outdoor pool, gym, coffee bar, dog park, and secure and gated parking garage.

8. Debtor NB Vue Mac, DST ("Vue Mac") is a Delaware Statutory Trust that owns and operates "The Vue on MacGregor Student Housing Apartments" (the "Vue Mac Facility") located at 4460 S. MacGregor Avenue, Houston, Texas 77021. The Vue Mac Facility is located near the University of Houston ("UH") campus and offers 115 fully furnished and unfurnished apartments, with a total of 347 beds, for UH students. The Vue Mac Facility also offers a host of luxury amenities for its student tenants, including an outdoor pool, two gyms, study areas, and a dog park.

**Challenges Arising from the COVID-19 Pandemic**

9. Both the Loft Vue Facility and Vue Mac Facility have suffered from enormous financial distress in the wake of the COVID-19 pandemic, which is the precipitating cause of these chapter 11 cases. In March 2020, and in response to the pandemic, both TCU and UH suspended all in-person instruction for its students and transitioned to a fully-remote learning environment. The suspension of in-person instruction resulted in a substantial percentage of the tenants in both the Loft Vue Facility and Vue Mac Facility (both of which were nearly fully leased up) moving out of their apartments.

10.   Concurrently with the shift to fully remote learning at TCU and UH, the state of Texas enacted legislation introducing a moratorium on tenant evictions, which had a disastrous impact on the Debtors, in that they were obligated to continue to provide use and occupancy to any student-tenant who wished to stay in the Loft Vue Facility and Vue Mac Facility, but were not necessary permitted to collect rent.  Student-tenants that did not pay rent (whether they stayed in the building or not) could not be evicted, and because of the institution of remote learning, it was impossible to replace tenants that departed.  Meanwhile, both Debtors, as more fully described below, were expected to continue making debt service payments to Fannie Mae, as well as payments to vendors and service providers.

11.   Limitations on in-person instruction and on-campus activities, and the wide availability of remote learning options, at both TCU and UH carried through to the 2020-21 academic year.  As a result, demand for apartments at both the Loft Vue Facility and Vue Mac Facility were only fraction of what they were in pre-COVID academic years, which in turn had a pronounced impact on revenue, profitability, and ability to meet obligations to their lenders and vendors.  In fact, Loft Vue experienced a significant drop in revenue in 2021 (14% or $122,980) compared to 2020, which itself was down 14%, or $117,802.00, compared to 2019 (the last full pre-pandemic year).  The combined loss of income since the start of the pandemic if over $240,000, which has caused substantial financial hardship.

12.   Vue Mac has seen even more pronounced losses since the start of the pandemic.  In 2019, Vue Mac generated total revenues of $1,776,660.  2021 revenues are tracking approximately 32% lower than in 2019, with year to date revenues of $1,105,159.

13.   Even with the severity of the pandemic decreasing and in-person instruction starting to return to both TCU and UH, the daunting challenges facing Loft Vue and Vue Mac are expected

to continue for at least the next academic year. These challenges are underscored by the current lease-ups for the 2021-22 academic year, which continue to substantially lag pre-pandemic periods. Without additional lease-ups in the next 30 days (which both Debtors are aggressively pursuing, but are also realistic about the fact that this upcoming school year will still not be "back to normal"), this upcoming academic year will continue to be one of depressed rent revenues.

14. These depressed revenues have left both Loft Vue and Vue Mac unable to service their independent debt obligations to both their senior secured lender (Fannie Mae) and their trade creditors.

15. *Pre-Petition Issues with Fannie Mae*. Both Loft Vue and Vue Mac are borrowers under separate loan and security agreements with their senior secured lender, Fannie Mae.

**Loft Vue**

16. Loft Vue is the borrower under that certain *Loan and Security Agreement*, dated as of September 30, 2016, with Berkeley Point Capital, LLC as original lender and servicer, in the original principal amount of $10,712,000.00. This loan is evidenced by that certain *Multifamily Note*, also dated as of September 30, 2016, and is secured by that certain *Multifamily Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing*, recorded at Instrument Number D216230304 with the Tarrant County, Texas recorder, covering the Loft Vue Facility's real and personal property. The foregoing loan and security documents (collectively, the "Loft Vue Loan Documents") were assigned to Fannie Mae.

17. Historically, Loft Vue had been in substantial compliance with its obligations to Fannie Mae under the Loan Documents, but the COVID-19 pandemic and concomitant loss of rent revenue almost immediately caused Loft Vue to default on its payment obligations. On May 8, 2020, Loft Vue and Fannie Mae entered into a first forbearance agreement, pursuant to which Loft

Vue was given certain temporary payment relief for approximately 90 days. With the pandemic still raging at the conclusion of the initial forbearance period, Loft Vue remained unable to meet its debt service obligations to Fannie Mae. Fannie Mae gave notice of the acceleration of the loan to Loft Vue on August 24, 2020.

18. In order to avoid Fannie Mae foreclosing on its deed of trust and security agreement, Loft Vue entered into that certain Loan Modification Agreement on November 1, 2020. Among other things, the Loan Modification Agreement required Loft Vue to: (i) resume monthly payments of interest (with principal payments deferred for one year); (ii) make certain required deposit payments to Fannie Mae (including for taxes and insurance); (iii) pay monthly installments of principal and interest for the months of May through September 2020 over a period of 24 months; (iv) make additional deposit payments for required repairs to the Loft Vue Facility; and (v) fund a "Debt Service Reserve Account" in the amount of $151,920.50.

19. While Loft Vue had little choice but to execute the Loan Modification Agreement in order to avoid a foreclosure sale, it quickly found itself in default again with Fannie Mae, unable to meet the substantial financial obligations of the Loan Modification Agreement (including funding the Debt Service Reserve Account). Fannie Mae again declared a default and scheduled a foreclosure sale for Loft Vue for January 6, 2021.

20. Once again, Loft Vue was put in a position where it either had to negotiate a new loan modification agreement, allow the Loft Vue Facility to be foreclosed on (which was not a viable option), or seek bankruptcy protection. On January 5, 2021, after extensive negotiations, Loft Vue executed a Forbearance and Second Loan Modification Agreement with Fannie Mae. This agreement again required Loft Vue to make a $306,476.57 payment to Fannie Mae in order to "buy" an additional forbearance and cure prior defaults, to resume interest payments and

tax/insurance deposits pursuant to the first Loan Modification Agreement, and to fund certain repair deposits.

21. Including the cure payment, Loft Vue made approximately $500,000 in payments to Fannie Mae after execution of the Second Loan Modification Agreement. These payments nearly wiped out Loft Vue's limited cash reserves, and required substantial infusions of cash from both me and certain of the Loft Vue investors.

22. In April 2021, Loft Vue found itself once again unable to timely service its substantial debt obligations under the Loan Documents, and Fannie Mae once again declared a default, accelerated the loan, and noticed up a foreclosure sale for July 6, 2021. Loft Vue attempted on multiple occasions to obtain an additional forbearance period to facilitate a long-term solution to the repeated defaults committed under the Loan Documents. It requested long-term deferrals of principal and interest from Fannie Mae to allow it to properly maintain the Loft Vue Facility through what is expected to be another calendar year of below-average rental income. It asked for a reduction or waiver of the substantial prepayment penalty in place under the Loan Agreement, which would have allowed Loft Vue to go to market to either sell the property or refinance Fannie Mae out. Fannie Mae refused these requests. Fannie Mae insisted upon payment of $667,000 (representing all past due principal and interest, default interest, legal fees, and previously deferred amounts) to reinstate the loan and avoid foreclosure. This was an impossible demand for Loft Vue to meet. Accordingly, in order to preserve the substantial equity in the property and in order to protect both creditors and investors, Loft Vue made the difficult decision to file a chapter 11 petition to stay Fannie Mae's foreclosure campaign.

23. As of the Petition Date, Loft Vue believes that it is indebted to Fannie Mae for principal, accrued interest, and fees and costs in an amount exceeding $11 million.

**Vue Mac**

24. The facts and circumstances leading to Vue Mac's chapter 11 filing are substantially identical to those of Loft Vue.

25. Vue Mac is the borrower under that certain *Multifamily Loan and Security Agreement*, dated as of December 18, 2015, with Berkeley Point Capital, LLC as original lender and servicer, in the original principal amount of $23,265,000.00. This loan is evidenced by that certain *Multifamily Note*, also dated as of December 18, 2015, and is secured by that certain *Multifamily Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing*, recorded at Instrument Number 20150570034 with the Harris County, Texas recorder, covering the Vue Mac Facility's real and personal property. The foregoing loan and security documents (collectively, the "Vue Mac Loan Documents") were assigned to Fannie Mae.

26. Historically, Vue Mac had been in substantial compliance with its obligations to Fannie Mae under the Loan Documents, but the COVID-19 pandemic and concomitant loss of rent revenue almost immediately caused Vue Mac to default on its payment obligations. On May 8, 2020, Vue Mac and Fannie Mae entered into a first forbearance agreement, pursuant to which Loft Vue was given certain temporary payment relief for approximately 90 days. With the pandemic still raging at the conclusion of the initial forbearance period, Vue Mac remained unable to meet its debt service obligations to Fannie Mae. Fannie Mae gave notice of the acceleration of the loan to Vue Mac on August 24, 2020.

27. In order to avoid Fannie Mae foreclosing on its deed of trust and security agreement, Vue Mac entered into that certain Loan Modification Agreement on November 1, 2020. Among other things, the Loan Modification Agreement required Vue Mac to: (i) resume monthly payments of interest (with principal payments deferred for one year); (ii) make certain required

deposit payments to Fannie Mae (including for taxes and insurance); (iii) pay monthly installments of principal and interest for the months of May through September 2020 over a period of 24 months; (iv) make additional deposit payments for required repairs to the Loft Vue Facility; and (v) fund a "Debt Service Reserve Account" in the amount of $245,025.00.

28. While Vue Mac had little choice but to execute the Loan Modification Agreement in order to avoid a foreclosure sale, it quickly found itself in default again with Fannie Mae, unable to meet the substantial financial obligations of the Loan Modification Agreement (including funding the Debt Service Reserve Account). Fannie Mae again declared a default and scheduled a foreclosure sale for Vue Mac for January 6, 2021.

29. Once again, Vue Mac was put in a position where it either had to negotiate a new loan modification agreement, allow the Vue Mac Facility to be foreclosed on (which was not a viable option), or seek bankruptcy protection. On January 5, 2021, after extensive negotiations, Vue Mac executed a Forbearance and Second Loan Modification Agreement with Fannie Mae. This agreement required Vue Mac to make a $503,523.43 payment to Fannie Mae in order to "buy" an additional forbearance and partially cure prior defaults, to resume interest payments and tax/insurance deposits pursuant to the first Loan Modification Agreement, and to fund certain repair deposits.

30. Including the cure payment, Vue Mac made over $1,000,000 in payments to Fannie Mae after execution of the Second Loan Modification Agreement. These payments nearly wiped out Vue Mac's limited cash reserves, and required substantial infusions of cash from both me and certain of the Vue Mac investors.

31. In April 2021, Vue Mac found itself once again unable to timely service its substantial debt obligations under the Loan Documents, and Fannie Mae once again declared a

default, accelerated the loan, and noticed up a foreclosure sale for July 6, 2021. Vue Mac attempted on multiple occasions to obtain an additional forbearance period to facilitate a long-term solution to the repeated defaults committed under the Loan Documents. It requested long-term deferrals of principal and interest from Fannie Mae to allow it to properly maintain the Vue Mac Facility through what is expected to be another calendar year of below-average rental income. It asked for a reduction or waiver of the substantial prepayment penalty in place under the Loan Agreement, which would have allowed Vue Mac to go to market to either sell the property or refinance Fannie Mae out. Fannie Mae refused all of these requests. Fannie Mae insisted upon a payment of approximately $1.4 million (representing all past due principal and interest, default interest, legal fees, and previously deferred amounts) to reinstate the loan and avoid foreclosure. This was an impossible demand for Vue Mac to meet. Accordingly, in order to preserve the substantial equity in the property and in order to protect both creditors and investors, Vue Mac made the difficult decision to file a chapter 11 petition to stay Fannie Mae's foreclosure campaign.

32.     As of the Petition Date, Vue Mac believes that it is indebted to Fannie Mae for principal, accrued interest, and fees and costs in an amount exceeding $24 million.

**Objectives of Chapter 11 Cases**

33. The Debtors intend to use the "breathing room" afforded by the Bankruptcy Code to either effectuate a sale of the Loft Vue Facility and Vue Mac Facility, or to identify a replacement lender to refinance the Fannie Mae indebtedness on terms that will give the Debtors the flexibility necessary to manage its limited liquidity until the pandemic has resolved and students are fully back on campus. The Debtors intend to move expeditiously in this respect, and will be seeking retention of a broker to assist them in this effort.

34. Overall, the Debtors' intention is to seek approval of a transaction in an expeditious fashion that will satisfy the claims of Fannie Mae and the Debtors' various trade creditors, and provide a return on equity for the investors of each of the Debtors, most of whom are retirees on fixed incomes.

## PART II – FIRST-DAY PLEADINGS

**A.    Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief ("Joint Administration Motion")**

35. By the Joint Administration Motion, the Debtors seek to have their cases procedurally, but not substantively, consolidated, and that the Court maintain one file and docket, and a consolidated caption, for both of the jointly administered cases.

36. Joint administration of these chapter 11 cases will provide significant administration convenience without harming the substantive rights of any party in interest. Many motions, hearings, and orders in these chapter 11 cases will affect both of the Debtors. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration also will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

**B.     Application for Order Pursuant to Section 327(a) of the Bankruptcy Code Authorizing the Retention of Tucker Ellis LLP as Attorneys for the Debtors and Debtors in Possession ("Tucker Ellis Retention Application")**

37.     The Debtors have selected the law firm of Tucker Ellis LLP ("Tucker Ellis") to act as their attorneys in connection with the prosecution of the chapter 11 cases and will file a retention application with the Court within twenty-one days of the Petition Date.

38.     Due to Tucker Ellis's recognized expertise in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code, as well as its particular experience with the Debtors (having represented the Debtors in negotiations with Fannie Mae since October 2020), I believe that Tucker Ellis is highly qualified to assist the Debtors with the legal issues likely to arise in these chapter 11 cases.

39.     Prior to the Petition Date, the Debtors consulted with Tucker Ellis with respect to, among other things, the First and Second Loan Modification Agreements, their obligations to Fannie Mae under the Loan Documents, and Fannie Mae's declaration of defaults and efforts to conduct a foreclosure sale of the Loft Vue Facility and Vue Mac Facility.  Through such consultations, Tucker Ellis has become familiar with the Debtors' business and legal affairs. Furthermore, the attorneys of Tucker Ellis who will advise the Debtors in these cases have considerable knowledge and experience in the field of bankruptcy law and debtors' and creditors' rights, including insolvencies, restructurings and business reorganizations and liquidations under chapter 11 of the Bankruptcy Code, as well as in other areas of law related to these chapter 11 cases.

40.     The Debtors have agreed to pay Tucker Ellis compensation on an hourly basis, plus reimbursement of actual and necessary expenses and other charges incurred by Tucker Ellis.  I believe the fees that Tucker Ellis will charge the Debtors, as set forth in the Declaration of Thomas

R. Fawkes to be filed in support of Tucker Ellis's retention application, are fair and reasonable in light of prevailing market rates, both in and out of chapter 11 proceedings, and Tucker Ellis's extensive experience and the scope of the work to be performed pursuant to this retention.

41. I believe Tucker Ellis is well qualified to represent the Debtors as debtors in possession in these chapter 11 cases and that the retention of Tucker Ellis is necessary and in the best interests of the Debtors, their estates and creditors.

**C. Application for Order Pursuant to Section 327(a) of the Bankruptcy Code Authorizing the Retention of Munsch Hardt Kopf & Harr, P.C. as Co-Counsel for the Debtors and Debtors in Possession ("Munsch Retention Application")**

42. The Debtors have selected the law firm of Munsch Hardt Kopf & Harr, P.C. ("Munsch") to act as their Texas co-counsel in connection with the prosecution of the chapter 11 cases and will file a retention application with the Court within twenty-one days of the Petition Date.

43. Due to Munsch's recognized expertise in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code, as well as its extensive expertise representing debtors, creditors, and other parties-in-interest in complex chapter 11 cases before this Court, I believe that Munsch is highly qualified to assist the Debtors with the legal issues likely to arise in these chapter 11 cases.

44. While Munsch did not represent the Debtors until just prior to the commencement of these cases, Munsch attorneys have represented other student housing entities related to Nelson Partners in complex litigation in Texas, and therefore have a strong command of the student housing industry, and the challenges that the industry has faced during the pandemic. Furthermore, the attorneys of Munsch who will advise the Debtors in these cases have considerable knowledge and experience in the field of bankruptcy law and debtors' and creditors' rights, including

insolvencies, restructurings and business reorganizations and liquidations under chapter 11 of the Bankruptcy Code, as well as in other areas of law related to these chapter 11 cases.

45. The Debtors have agreed to pay Munsch compensation on an hourly basis, plus reimbursement of actual and necessary expenses and other charges incurred by Munsch. It is anticipated that Munsch will not only provide local assistance to Tucker Ellis in the discharge of its professional duties to the Debtors, but will collaborate with Tucker Ellis on the development and carrying out of legal strategy in these cases, while avoiding duplication of effort. I believe the fees that Munsch will charge the Debtors, as set forth in the Declaration of Thomas D. Berghman to be filed in support of Munsch's retention application, are fair and reasonable in light of prevailing market rates, both in and out of chapter 11 proceedings, and Munsch's extensive experience and the scope of the work to be performed pursuant to this retention.

46. I believe Munsch is well qualified to represent the Debtors as debtors in possession in these chapter 11 cases and that the retention of Munsch is necessary and in the best interests of the Debtors, their estates and creditors.

**D.     Motion of the Debtors for Entry of Interim and Final Orders:  (i) Authorizing the Debtors to (a) Use Cash Collateral and (b) Grant Adequate Protection to the Secured Lender; (ii) Scheduling a Final Hearing; (iii) Modifying the Automatic Stay; and (iv) Granting Related Relief (the "Cash Collateral Motion")**

47.     Fannie Mae, the secured lender to both of the Debtors, has consented to the Debtors' use of cash collateral pursuant to the terms and conditions of an Interim Order (I) Authorizing Post-Petition Use of Cash Collateral, (II) Granting Adequate Protection to Secured Lender; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), (IV) Modifying the Automatic Stay and (V) Granting Related Relief (the "Interim Cash Collateral Order") pursuant to sections 105, 361, 362 and 363 of the Bankruptcy Code, Rules 4001, 6003 and 9014 of the Federal Rules of Bankruptcy Procedure, and Rules 4001-1 and 4002-1 of the Bankruptcy Local Rules for the Southern District of Texas.  Under the Interim Cash Collateral order, the Debtors seek authority to use cash collateral and grant Fannie Mae adequate protection with respect to their pre-petition liens in the form of replacement liens and super-priority claims, subject to the Carve-Out defined in the Interim Cash Collateral Order.  The Debtors have also agreed to certain Milestones, set forth in the Interim Cash Collateral Order, for the sale of their properties and/or the refinancing of their debt obligations to Fannie Mae.

48.     It is my belief that the Debtors require the use of cash collateral to fund their day-to-day operations.  Indeed, absent such relief, the Debtors will be unable to properly maintain and operate the Loft Vue Facility and Vue Mac Facility, the effect of which will be that tenant comfort and safety will be adversely impacted, with potential disastrous consequences for the Debtors, their estates and creditors.  Accordingly, the Debtors seek authority, pursuant to section 363(c)(2) of the Bankruptcy Code, to use their prepetition cash collateral in the operation of its business and the administration of the chapter 11 cases on the terms and conditions set forth in the Interim Cash

Collateral order. The Debtors have not been able to obtain, in the ordinary course of their businesses, unsecured credit under section 503(b)(1) of the Bankruptcy Code as an administrative expense sufficient to meet their operating needs.

49. In order to adequately protect Fannie Mae's interest in the cash collateral, the Debtors are proposing to grant Fannie Mae adequate protection in the form of additional and replacement security interests and liens in the Collateral (as defined in the Interim Cash Collateral Order), which shall be junior only to the Carve-Out provided for in the Interim Cash Collateral Order. In addition, Fannie Mae will be granted an allowed superpriority administrative expense claim to compensate it for any post-petition diminution in value of the Collateral, which shall have priority, except with respect to the Carve-Out, over all other claims in the chapter 11 cases under section 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code. A complete discussion of the terms affecting the Debtors' post-petition use of cash collateral is set forth in the Cash Collateral Motion and proposed Interim Cash Collateral Order.

50. Without immediate access to the cash collateral, the Debtors will face a liquidity crisis that will threaten the viability of their businesses. If cash is not available to pay necessary operating and maintenance expenses, the Debtors will face a substantial, if not devastating, loss of tenant support, and will imperil the safety and welfare of the Debtors' tenants, whose continued support (and rental income) is critical to the success of these cases. Continuing to pay operating and maintenance expenses is also essential to maintaining the value of the facilities, and therefore Fannie Mae's collateral. I therefore submit that obtaining the interim and final relief requested in the Cash Collateral Motion is necessary and appropriate.

**E.     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management Systems and Maintain Existing Bank Accounts and (B) Maintain Existing Business Forms, (II) Scheduling a Final Hearing, and (III) Granting Related Relief ("Cash Management Motion")**

51. By the Cash Management Motion, the Debtors seek entry of interim and final orders authorizing them to (i) continue to operate their Cash Management Systems and maintain their existing bank accounts; and (ii) maintain existing Business Forms.

52. In the ordinary course of each of the Debtors' businesses, the Debtors utilize Cash Management Systems to facilitate the timely and efficient collection, management, transfer, and disbursement of funds. The current Cash Management Systems have been utilized by the Debtors for years leading up to the Petition Date. The Cash Management Systems are overseen by the in-house accounting professionals of Nelson Partners Professional Real Estate ("NPPRE") (who provides most of the back-office functions for the Debtors) who implement cash management controls for entering, processing, and releasing funds for the Debtors. NPPRE's in-house accounting professionals regularly reconcile the Debtors' books and records to ensure that all transfers are properly accounted for. Any disruption to the Cash Management Systems would have an immediate adverse effect on the Debtors' businesses and operations to the detriment of the Debtors' estates and all of the Debtors' stakeholders and creditors.

53. As of the Petition Date, the Cash Management Systems include a total of seven (7) active bank accounts (collectively, the "Bank Accounts"), each of which is identified below. The Bank Accounts reside at Citizens Community Bank (the "Cash Management Bank"). The following table summarizes the Bank Accounts and Cash Management Systems residing at the Cash Management Bank:

| Debtor | Cash Management Bank | Cash Management Systems | Account Number Ending |
|---|---|---|---|
| Loft Vue | Citizens Community Bank | Operating Account | 3452 |
| | | Security Deposits and Sources | 3657 |
| | | Distributions | 3797 |
| Vue Mac | Citizens Community Bank | Operating Account | 7614 |
| | | Security Deposits | 7665 |
| | | Distributions | 1972 |
| | | Sources | 1778 |

54. The Debtors' current Cash Management Bank, Citizens Community Bank, is not on the U.S. Trustee's current approved depository list. However, the Debtors believe that the Cash Management Bank is well capitalized and financially stable and therefore well positioned to perform the depository and cash management functions required by the Debtors during these chapter 11 cases. To ensure their businesses continue to operate without interruption, the Debtors desire to maintain their existing Bank Accounts to disburse funds to employees and vendors on a timely basis. In addition, the Debtors request authority to pay any unpaid Bank Fees to their Cash Management Bank accruing prior to the Petition Date, and to use all Business Forms (including checks, letterhead, correspondence forms, invoices, and other business forms) that were in place prior to the Petition Date.

55. The foregoing relief will allow the Debtors to more effectively and efficiently administer their affairs in bankruptcy, and will not cause harm or prejudice to any parties-in-interest in these cases. Accordingly, I submit that obtaining the interim and final relief requested in the Cash Management Motion is necessary and appropriate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

July 20, 2021                                             /s/ Patrick Nelson
                                                                              Patrick Nelson, Authorized Representative